IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

STEVEN L. HANSON,

                              Plaintiff,

v.                                                          OPINION and ORDER

KALAHARI DEVELOPMENT LLC, d/b/a                      17-cv-879-jdp
KALAHARI RESORT & CONVENTION CENTER,

                              Defendant.

---

Plaintiff Steven Hanson worked as a supervisor in the maintenance department at the Kalahari Resort and Convention Center from 2014 to 2016. Hanson contends that Kalahari violated his rights under Title VII of the Civil Rights Act in two ways: (1) failing to respond appropriately when he was harassed by coworkers because of his religion; and (2) terminating him for complaining about the harassment.

Kalahari has filed a motion for summary judgment on all of Hanson's claims. Dkt. 12. Hanson has moved to strike one aspect of Kalahari's reply brief in support of their summary judgment motion because it introduces new evidence. Dkt. 25. The court will grant the motion to strike, but that evidence makes no difference to the result in this case. Even if the court disregards the evidence, Kalahari is entitled to summary judgment on all of Hanson's claims.

UNDISPUTED FACTS

The following facts are undisputed, except where noted.

A. Hanson hired as maintenance supervisor

In December 2014, Hanson was hired to work in the maintenance department at the Kalahari Resort and Convention Center in Lake Delton, Wisconsin, which is operated by

defendant Kalahari Development, LLC. After completing an initial probationary period, Hanson assumed the role of third shift supervisor of the maintenance department in March 2015. During his employment at the Kalahari, Hanson reported to Jeff Beckwith, the facilities manager.

Hanson's first year and a half at the Kalahari passed without incident, for the most part. Hanson acknowledges that there were some personality clashes within the maintenance department, and Beckwith observed that Hanson's tendency to tell his peers how to do their jobs was a source of friction between Hanson and the other supervisors. But the events that gave rise to this litigation didn't occur until the final two-and-a-half months of Hanson's employment.

**B. Alleged harassment**

At a supervisors' meeting in September 2016, as part of an icebreaker exercise initiated by Beckwith, Hanson revealed certain of his religious convictions to his colleagues. Hanson is a Seventh Day Adventist. When prompted to disclose a fact that others would not know about him, Hanson said that he "believed in the Ten Commandments and commented about how some people at work took the Lord's name in vain." Dkt. 21, ¶ 4.

The following week, on September 19, Hanson led the supervisors' weekly meeting because Beckwith was absent. During this meeting, some of Hanson's colleagues complained about having to work weekends because it interfered with their religious observances. Hanson responded that weekend work is a necessary aspect of working in the hospitality industry. He noted that, as a Seventh Day Adventist, he is supposed to refrain from working and focus only on worshipping the Lord from Friday sundown until Saturday sundown. Nonetheless, he had never requested that the Kalahari accommodate his religious beliefs by giving him Saturdays

2

off. (Hanson says that he left this meeting feeling "attacked and distraught," *id.* ¶ 10, but he doesn't explain why.)

Later that day, Hanson discovered that someone had drilled a hole through a Bible, stuck a bolt in it, and chained it to his work cart. Hanson immediately informed Beckwith what happened and emailed Todd Nelson, the owner of the Kalahari, the following:

> It is so great working with these so called professionals. I want video documentation of WHO put a bolt through a red holy bible that was [on] a chain in the indoor maint[enance] shop and then walked out of the shop to hang it on the tool box . . . . I support good natured horseplay but this is not cool especially after I publicly announce I believe in and follow the ten commandments during one of the lets get to know each other meetings in this FAMILY ORIENTATED BUSINESS.

Dkt. 14-3, at 2. Nelson responded, "Sorry this happened to You. I have forwarded this onto Jeff Beckwith and my son Todd Jr." *Id.*

Beckwith began investigating Hanson's complaint. He reviewed hours of security footage but saw nothing relevant. He also interviewed known pranksters on staff and warned them not to engage in harassing behaviors. Despite these efforts, Beckwith was unable to identify the culprit and told Hanson that the investigation had turned up nothing.

Hanson experienced no additional incidents of harassment based on his religion but he did experience two other incidents that he considered harassing. First, on September 30, an unknown person left a boot on his desk. *See* Dkt. 19-12 (photograph of boot). Second, on October 16, Hanson found a promotional tote bag from a pest-control company that said "Revenge to eliminate the pest" tied to his locker. *See* Dkt. 19-13 (photograph of bag). Hanson did not report either incident to management.

## C. Hanson receives a coaching form

In the aftermath of the Bible incident, Beckwith issued Hanson a coaching form admonishing him not to contact Nelson again without first following the chain of command. *See* Dkt. 14-5, at 2 ("Under no circumstance do we email Todd Nelson with a situation that could be handled within our department. We have talked about conflict resolution in the past at various times. Everyone has been told that it is handled at its 'lowest possible level.' Emailing Mr. Nelson to inform him of this situation is completely uncalled for and should never happen again."); *see also* Dkt. 19-4 (Kalahari's "chain of command/open door policy," which provides that employees are "strongly urged to seek resolution by following their chain of command."). Hanson was not subjected to any discipline for contacting Nelson.

## D. Hanson lodges additional complaints

On November 6, Hanson sent an email to Hugh Schavier, Kalahari's corporate facilities director and Beckwith's supervisor. In it, he stated that he wanted Schavier's "thoughts or direction for a few items" and "to just vent on other[] [items]." Dkt. 14-6, at 3. Over the course of the eight paragraphs that followed, he complained about numerous issues. He asked about whether he should write up a fellow supervisor for telling two subordinates that they could leave a meeting that Hanson was running, and complained about staff demoralization and various maintenance issues. He did not mention the Bible incident or otherwise complain about religious harassment. Schavier forwarded the email to Beckwith with a note that said "Jeff, Seriously!! Does this guy have any valid points to what he is saying?" *Id.* at 2.

Beckwith brought up the email at the team meeting the following day. He intended to use it to discuss the need for better teamwork and to provide an opportunity for anyone to raise safety or other concerns. Although Beckwith quoted aloud from the email, he didn't

4

disclose who authored it. Instead, Hanson identified himself as the writer during the meeting, printed copies of the email, and handed them out to his colleagues. He then left the meeting, stating that it was "past his bedtime," Dkt. 23, ¶ 54, even as Beckwith warned him that doing so would be considered insubordination. He proceeded to the Kalahari human resources department to "ask permission to stop the meeting." Dkt. 21, ¶ 34. He met with two human resources staff and "begg[ed] for forgiveness for leaving the meeting," noting that he "could not take much more harassment after already dealing with a full shift of things." Dkt. 11 (Hanson Dep. 88: 7–8; 11–14).

Beckwith and Anna Rogers, Kalahari's corporate assistant director of human resources, held a follow-up meeting with Hanson on November 11. At this meeting, Beckwith and Rogers explained that, although Hanson's conduct on November 7 was insubordinate, he would not be disciplined. They also discussed Hanson's ongoing concern that the Bible incident had not been investigated or taken seriously. Beckwith and Rogers explained that they had investigated the incident and considered it to be serious and inappropriate, but that they had not been able to identify the perpetrator. Hanson remained dissatisfied and, on November 16, he called the Kalahari Safety Hotline and left a message about the Bible incident.

E. Termination of Hanson's employment

On November 28, near the end of his shift, Hanson emailed the first-shift supervisor, Joan Garcia, suggesting a list of maintenance issues to be addressed during Garcia's shift. Garcia responded with an angry email admonishing Hanson to stop telling others what to do. *See* Dkt. 14-1, at 2 ("You could've taken care of those issues, but AGAIN you like to passed it on to others . . . it's a lot easy to spend 2 hours making up an email to talk about it huh! STOP!"). After Hanson left work that day, he learned that a bank was foreclosing on his father's shop.

5

He suspected that Kalahari knew about or was involved with the foreclosure in some way. Dkt. 11 (Hanson Dec. 122:17).

As a result of these difficulties, Hanson sent another email to Nelson on November 30, with "Moving on." in the subject line. The email read:

> Just been verbally evicted from my other dream and I used to pray to God for assistance. I just hope that even though I stood up for YOUR companies founded or displayed beliefs no one within the company had anything to do with my compromised situation.
>
> I will be leaving the kalahari as soon as I possibly can.

Dkt. 15-2, at 2. A short time later, Rogers contacted Hanson to tell him that the Kalahari was accepting his resignation effective immediately. Hanson emailed Nelson twice, *see* Dkt. 19-2 and Dkt. 19-9, and texted Beckwith, *see* Dkt. 19-10, protesting that he had *not* resigned and asking whether he had been fired. The Kalahari refused to allow Hanson to return to work.

Rogers says that, once human resources learned that Hanson's departure was imminent, it decided to make his resignation effective immediately. She contends that the Kalahari did not want to be unexpectedly without full staffing in the maintenance department heading into the holiday season, and it wanted to take steps to replace Hanson as quickly as possible. Hanson disputes this characterization and contends that the Kalahari fired him in retaliation for his complaints of religious discrimination.

## ANALYSIS

Hanson asserts two claims under Title VII of the Civil Rights Act: (1) a hostile work environment claim based on the religion-related incidents he experienced; and (2) a retaliation claim for allegedly terminating him for complaining about the harassment. He originally asserted additional claims under the Americans with Disabilities Act based on his degenerative

6

disc disease and sciatica, but he abandoned those claims in response to Kalahari's summary judgment motion. *See* Dkt. 20, at 2.

A. **Summary judgment standard**

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a while, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931(7th Cir. 1996).

B. **Religious harassment**

Title VII of the Civil Rights Act makes it unlawful for an employer to refuse to hire, discharge, or otherwise discriminate against an individual because of the individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). It also prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prevail on a hostile work environment claim, Hanson must demonstrate that: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on Hanson's protected status, i.e., his religion; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014).

Hanson's hostile work environment claim must be dismissed because, even assuming without deciding that his evidence satisfies the first three elements, he fails to make a showing under the fourth element. When the harassment at issue is perpetrated by the plaintiff's coworkers rather than supervisors, the plaintiff "must show that the employer has been negligent either in discovering or remedying the harassment." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011) (citations and internal quotations omitted), *aff'd*, 570 U.S. 421 (2013). Kalahari can avoid liability if it can show that it took "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).

Here, the only incident of religious harassment that Hanson reported to supervisors was the September Bible incident. It is undisputed that, once Hanson reported the incident to management, Beckwith reviewed hours of surveillance footage, interviewed potential suspects, and reminded them of Kalahari's anti-harassment policy. It is also undisputed that Hanson experienced no additional harassment of a religious nature. Hanson argues that Kalahari should have produced a list of the persons interviewed, an investigative report, and witness statements, *see* Dkt. 20, at 8, but he doesn't explain why such measures were necessary.

Because Kalahari responded promptly to Hanson's harassment complaint and took action that was likely to and in fact did prevent the conduct from recurring, there is no basis for employer liability on Hanson's hostile work environment claim.

## C. Retaliation

Title VII makes it unlawful to retaliate against an employee for opposing discriminatory practices. *See* 42 U.S.C. § 2000e-3(a). To make a prima facie case of retaliation, Hanson must adduce evidence of three elements: (1) statutorily protected activity; (2) a materially adverse

action; and (3) a causal connection. *See Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014).

This claim fails because Hanson points to no evidence of a causal link between his complaints about religious harassment and his termination, other than timing. Hanson complained about the Bible incident on September 19, November 11, and November 16, and he resigned or was fired from the Kalahari on November 30. But "suspicious timing alone is rarely enough to create an inference of retaliatory motive." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). "Suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011).

The timing in this case is not suspicious. The evidence shows that Kalahari ended Hanson's employment immediately after he informed Nelson that he planned to leave at his earliest opportunity. Hanson adduces no evidence to rebut Kalahari's asserted justification for the decision, which was that it wanted to hire a replacement for Hanson as soon as possible so as to ensure full staffing in the maintenance department over the holidays.

Because Hanson has failed to adduce any evidence that Kalahari subjected him to a religiously hostile work environment or retaliated against him for complaining about that harassment, the court will grant Kalahari's motion for summary judgment.

ORDER

IT IS ORDERED that:

1. Defendant Kalahari Development LLC's motion for summary judgment, Dkt. 12, is GRANTED;

2. Plaintiff Steven Hanson's motion to strike, Dkt. 15, is GRANTED;

3. The clerk of court is directed to enter judgment in favor of Kalahari and close this case.

Entered April 19, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge